# THE STATE OF WISCONSIN

## *vs.*

# WILLIAM CRANE.

Errors in spelling will not vitiate an indictment, unless they are such as might mislead the defendant.

In an indictment for an assault with intent to kill and murder, the word assault was written "assalt," or "assatt," the two last letters being looped and crossed: *Held,* that this did not vitiate the indictment.

Section 32 of chap. 133 of the Revised Statutes, is not to be limited and restricted by the specifications contained in § 31 of same chapter, so far as regards an assault with intent to murder.

The submission of an issue in a criminal case to a second jury, the first having been discharged because of disagreement, is not putting the defendant twice in jeopardy, for the same offence.

THIS case comes to the Supreme Court upon the report of the circuit judge, of questions of law which arose on the trial, and which he deemed of such importance as to require the opinion of the Supreme Court thereon.

The report is set out at length in the opinion of the court, except that a copy of the indictment was appended thereto, which charged, or intended to charge, the defendant below with an assault upon his wife, Anna K. Crane, with intent to kill and murder her. One objection taken to the indictment was, that no crime was charged therein, viz: that there was no assault alleged, and hence there could be no offence.

The indictment alleges that the defendant at, &c., on, &c., with force and arms, feloniously made an "assalt" in and upon the body of Anna K. Crane, and then and there with a pitchfork, with force and arms did beat, strike, wound, &c."

The objection was to the spelling of the word "assault," it being contended that the word as written in the indictment was "assatt," which had no meaning in the law. On the other hand it was urged that the writer had only misspelled the word by leaving out the letter *u*, spelling the word "assalt" which would be *idem sonans.* In the indictment the two last letters of the word in dispute were both looped like the chirographic *l,* and

were both crossed like the chirographic *t*, so that it was insisted on the one hand, that the word was "assatt," and on the other, that the word was "assalt," and having the same sound as the word properly written, should have the same effect.

The other points presented by the report of the judge are set out at large in the opinion.

*G. B. Smith*, Attorney-General, for the state.

*Ira C. Paine*, for the defendant.

*By the Court*, SMITH, J. This case comes here by the report of the circuit judge of Racine county, which is as follows:

"The defendant was indicted and tried at the April term of this court, A. D. 1854, for an assault upon his wife, with intent to murder her. The jury being unable to agree upon a verdict in the case, were discharged by the court without the consent of the defendant. At the October term of this court, a *nolle prosequi* was entered to said indictment on motion of the district attorney, and another indictment for the same offence (differing from the former indictment only in form) was preferred against the defendant at the same time, and he was arrested thereon. A motion was thereupon made on behalf of the defendant, that he be discharged from custody, on the ground, that he had been once put in jeopardy for the same offence charged in this indictment. This motion was overruled by the court, and at the April term the defendant was tried upon said last-mentioned indictment and convicted.

"On the trial, the following questions of law arose, to wit:

"1. Does the indictment in either count charge and set forth an indictable offence?

"2. If it does so charge, are the means by which the defendant sought to murder the prosecutrix sufficiently stated and set forth in the indictment?

"3. Is the indictment sufficient in form and substance? and

"4. Is his former trial above referred to, a bar to a conviction on this indictment?

"And being of the opinion that some of these questions are so important as to require the decision of the Supreme Court

thereon, I do hereby report the said questions of the law, together with the original indictment upon which said conviction was had, and so much of the case as is necessary to present said questions to the Supreme Court, for such, their decision in the premises; the said defendant desiring it and consenting thereto."

The first question presented by the report of the circuit judge is one which must be regarded as altogether technical. The objection is that the word intended for "assault" is written, in both counts "assatt." But it is hardly possible to conceive that the defendant or his counsel could have been misled by the misspelling of the common word "assault." Nor yet is there the slightest apology for the gross ignorance or gross carelessness of the person who drew the indictment, or of the clerk who may have copied it, or whomsoever the person may be who committed the blunder. An apology for such recklessness or ignorance on the part of one who pretends to rank as a member of a learned profession, is inconceivable. But gross and unpardonable as the error is, it would be placing the defendant in a position of which he would be ashamed, to make it available to him. To do so would establish another and a more perfect defence, which he has not set up. He does not claim to be *non compos mentis*. Nor should the due administration of justice be stayed by such gossamer obstacles as this. It is not our province to enter into a chirographical criticism upon the papers presented for our inspection, yet we cannot but remark that there is an implied fealty due to the laws of the language whose forms we invoke in giving expression to our thoughts and feelings. Though language was originally addressed to the ear through certain sounds, yet the wants of man inspiring his genius, gave rise to a mode of associating certain sounds addressed to the ear, with certain figures or characters addressed to the eye. As violence done to the former may result in the social outlawry of the offender, so ought an infraction of the laws of the latter to meet with condemnation of no less severity, more especially when committed by one whose social and professional position authorizes the requirement of at least a tolerable conformity to established rules. It would be well if a more rigid practice in regard to the preparation of papers deposited in the archives of the state, subject to inspection for all coming time, and indicating in some measure the

literary standard of the age, were insisted upon. But it seems, that in case the paper is legible, and the defendant is informed thereby of the nature of the accusation against him with sufficient certainty, errors in spelling will not be regarded unless they are such as might mislead the party. Such is not the case here.

But it is contended, that the means mentioned in this indictment, by which it is alleged, the accused attempted to kill and murder the prosecutrix, are none of them comprised in the statute which defines this crime; and hence are not within the statute.

The indictment alleges "that the defendant, at, &c., on, &c., with force and arms, feloniously made an assault in and upon the body of Anna K. Crane, and then and there *with a pitchfork*, with force and arms, did beat, strike, wound and ill treat her, the said Anna K. Crane, and then and there, the said William Crane, with the said pitchfork, did with force and arms beat and strike her, the said Anna K. Crane, divers terrible, grievous blows upon the head, arms, sides, back and other parts of the body of her, the said Anna K. Crane, and thereby grievously cut, bruised and wounded the said Anna K. Crane, in and upon her head, arms, sides, back and other parts of her body, inasmuch that her life was greatly despaired of, with intent her, the said Anna K. Crane, then and there feloniously and willfully, and of his malice aforethought, to kill and murder."

This second objection is based upon sections 31, 32 and 33 of chapter 133 of the Revised Statutes, which are as follows:

" Sec. 31. If any person, with malicious intent to maim or disfigure, shall cut out or maim the tongue, put out or destroy an eye, cut or tear off an ear, cut or slit or mutilate the nose or lip, or cut off or disable a limb or member of any person, every such offender, and every person privy to such intent, who shall be present, aiding in the commission of such offence, shall be punished by imprisonment in the state prison, not more than five years, nor less than one year, or by fine, not exceeding one thousand dollars, nor less than two hundred dollars."

" Sec. 32. If any person shall assault another, with intent to murder, or to maim or disfigure his person, in any of the ways mentioned in the next preceding section, he shall be punished by imprisonment in the state prison, not more than five years,

nor less than one year, or by fine, not exceeding one thousand dollars, nor less than one hundred dollars."

"Sec. 33. If any person shall attempt to commit the crime of murder, by poisoning, drowning or strangling another person, or by any means not constituting an assault with intent to murder, every such offender shall be punished by imprisonment in the state prison, not more than ten years, nor less than one year."

The counsel for the defendant insists, that the whole of section thirty-two (under which this indictment is framed) is restricted to, and to be construed by the specifications contained in section thirty-one. But we think differently. Section thirty-two describes in the first place, a distinct offence, viz: 1. The assaulting another with intent to murder him; and 2. The assaulting another with intent to maim or disfigure his person, in any of the ways mentioned in section thirty-one. It would be unreasonable, not to say preposterous, to suppose, that the legislature designed to limit the assault with intent to commit the crime of murder, to the means described in section thirty-one : that is, by assaulting another with intent to murder him by cutting out or maiming the tongue, or by putting out the eye, or by slitting or mutilating the nose or lip, &c. But the plain meaning is, that if any one shall assault another with intent to commit the crime of murder by any means whatever (except with a dangerous weapon, as mentioned in the 35th section); or shall assault another with intent to maim or disfigure him by any of the means described in the thirty-first section, he shall suffer the penalty fixed by the statute aforesaid. The assault with intent to murder is a distinct and substantive offence, and the assault with intent to maim or disfigure by any of the means described in the thirty-first section, is another distinct and substantive offence. The means by which the attempt to maim or disfigure is made, are required to be stated, such as by cutting out the tongue, slitting the nose or lip, &c.; but not so in regard to the means by which the assault with intent to murder is made. Section thirty-three describes other attempts to murder, which may or may not involve an assault; such as poisoning, &c., but which would, as in other cases, require to be stated with sufficient certainty.

But the third and last point taken by the defendant, is one of very great importance. He was indicted at the April term, 1854, and tried at the same term. An issue was made, a jury was impanneled and sworn, witnesses sworn and examined, and the case submitted to the jury, who, after deliberation, being unable to agree upon a verdict, were discharged by the court, without the consent of the defendant. At the succeeding October term, a *nolle prosequi* was entered upon the indictment, and at this same term another indictment for the same offence was found by the grand jury. The defendant contends that he has been once put in jeopardy of punishment for the same offence as that described in the last indictment.

It will not be denied, that the provision in our constitution, "that no person shall be twice put in jeopardy of punishment for the same offence," is wise and just. It is by no means a new principle in the administration of the criminal law; but the question as to what proceedings should be held to have put the person in jeopardy, has given rise to considerable discussion and a diversity of opinion. It is not our purpose, on this occasion, to review the cases in which this question has been the subject of adjudication. They differ in different states and countries, modified and controlled, it may be, by the different forms and usages of the different courts. In this state, except in capital cases, it is usual to adjourn the court or hearing from time to time during the progress of a trial, as occasion may require for rest and refreshment. On these occasions the jurors usually separate and convene again, at the meeting of the court for the resumption of business, until the evidence is closed, counsel have been heard, and the charge of the court given, and the case finally submitted. After this the jurors remain together under the charge of an officer, secluded from all communication but with each other, until they shall have agreed upon a verdict, or, until it becomes apparent that any further efforts to agree will prove unavailing, when they may be discharged. This has been our practice ever since the organization of the territory, and the uniform practice has also been to submit the case to another jury in case the first could not agree.

Section 20 of chapter 97 of the Revised Statutes, provides that, "When a jury, after due and thorough deliberation upon any

cause, shall return into court without having agreed upon a verdict, the court may state anew the evidence, or any part of it, and may explain to them anew the law applicable to the case, and may send them out again for further deliberation; but if they shall return a second time without having agreed upon a verdict, they shall not be sent out again without their consent, unless they shall ask from the court some further explanation of the law.

This statute was doubtless designed to relieve the jury from any liability to oppression, or undue severity on the part of the court, and to insure a verdict which would be the result of the voluntary action of their judgment and conscience. But if a failure to render a verdict would preclude further trial, the administration of criminal justice would be rendered insecure and uncertain. It can scarcely be doubted, that this section of the statute was enacted by the legislature in view of the uniform practice of our courts, and without the least idea or apprehension that any such results would follow the disagreement of a jury as are now claimed in behalf of this defendant.

It would require too much time to review the decisions which have been made on both sides of the question here raised, and it would be attended with but little practical benefit. We cannot bring our minds to the conclusion, that the members of the convention who framed the constitution, well knowing, as they did, the practice that had prevailed in the territory, could have supposed that the submission of an issue in a criminal case to a second jury, the first having been discharged because it was impossible for them to agree upon a verdict, would be putting a defendant twice in jeopardy, in the sense in which they employed that phrase in the constitution. Nor do we deem such a construction the necessary or proper one. If it was impossible for the jury to agree, the defendant was not in jeopardy of conviction (because conviction required unanimity), any more than if one of the panel had deceased after the cause was submitted, and before verdict.

Undoubtedly, after a jury has been impanneled and sworn in a criminal case, the defendant is entitled to have the trial progress, if it is practicable. But the ends of justice are not to be frustrated by the occurrence of those contingencies to which all

State of Wisconsin vs. Crane.

human affairs are liable, and which no prudence or diligence can foresee or prevent.

Such, it would seem, is the reasonable and just construction of the provision of our constitution in question, justified as well by enlightened adjudications, as by a recurrence to the history of the times and causes which demanded its recognition as one of the elements of fundamental law.

The conviction is approved.